IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

RECO WILSON,                          )
                                      )
        Plaintiff,                    )
                                      )
    v.                                )        Case No.    18-cv-498-RJD
                                      )
WEXFORD HEALTH SOURCES, INC.,         )
STEPHEN RITZ, DR. HECTOR GARCIA,      )
KIMBERLY BUTLER, DR. JOHN TROST,      )
and MICHAEL MOLDENHAUER,              )
                                      )
        Defendants.                   )

## MEMORANDUM AND ORDER

**DALY, Magistrate Judge:**

Plaintiff Reco Wilson, an inmate in the custody of the Illinois Department of Corrections

("IDOC"), filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging his constitutional rights were

violated while he was incarcerated at Menard Correctional Center ("Menard").   Plaintiff alleges

he was provided inadequate medical treatment and delayed care for a lump on his spine that caused

him pain.   The lump was surgically removed on November 9, 2017; however, Plaintiff had sought

treatment for the lump beginning in March 2011.

Following a threshold review of Plaintiff's complaint under 28 U.S.C. § 1915A (Doc. 6),

and entry of a summary judgment order on Defendants' motions for summary judgment on the

issue of exhaustion of administrative remedies (Doc. 63), Plaintiff proceeds on the following

claims:

Count 1:    Ritz, Garcia, Butler, Trost, and Moldenhauer were deliberately indifferent
            to the lump on Plaintiff's back in violation of the Eighth Amendment.

Count 2:    Wexford had policies and/or practices in place to deny Plaintiff needed
            healthcare for his lump in violation of the Eight Amendment.

Defendants filed motions for summary judgment on August 19, 2021 (Docs. 98 and 100) that are now before the Court.   Plaintiff filed responses to the motions, and Defendants Wexford, Ritz, Garcia, Trost, and Moldenhauer filed a reply.   For the reasons set forth below, the Motion for Summary Judgment for Deliberate Indifference to a Serious Medical Need filed by Defendants Moldenhauer, Ritz, Garcia, Trost, and Wexford (Doc. 98) is **GRANTED IN PART AND DENIED IN PART**, and the Motion for Summary Judgment filed by Defendant Butler (Doc. 100) is **GRANTED**.

## Factual Background

### *Plaintiff's Medical Treatment*

Plaintiff Reco Wilson has been incarcerated with the IDOC since 2009 (Reco Wilson Deposition, Doc. 99-1 at 11).   Plaintiff was transferred to Menard, where the claims in this lawsuit arise, in March 2009 (*Id.*).   Plaintiff discovered a lump in the middle of his back in March or April 2011 while he was taking a shower (*Id.* at 22).   Plaintiff testified the lump was in the middle of his spine, and caused pain and discomfort as it was difficult to sleep on his back (*Id.* at 23).   Plaintiff described his pain at the time as "high" (*Id.*).

Plaintiff first presented to the healthcare unit ("HCU") on April 24, 2011 concerning the lump near his spine (Plaintiff's Medical Records, Doc. 99-6 at 7).   The records indicate the lump was approximately egg-sized and soft, and caused Plaintiff difficulty sleeping and laying down (*Id.*)   Plaintiff rated his pain as a 6 out of 10 (*Id*)   Plaintiff was provided ibuprofen and referred to the doctor (*Id.*).

Plaintiff was seen on the MD sick call line on April 27, 2011 by an unknown medical provider (Doc. 99-6 at 8).   The doctor noted the lump was tender and assessed it as a possible

lipoma[1] (*Id.*).   The lipoma was measured at 6 x 2.5 centimeters (*Id.*).   X-rays of Plaintiff's spine were ordered and taken the same day (*Id.* at 8, 168).

On June 22, 2011, Plaintiff was seen by non-defendant Dr. Nwaobasi regarding the mass on his back (Doc. 99-6 at 9).   Dr. Nwaobasi measured the mass at 10 x 5 centimeters and assessed it as a possible lipoma (*Id.*).   Dr. Nwaobasi noted the x-rays showed no other gross abnormality (*Id.*).   Dr. Nwaobasi prescribed Motrin and noted he would follow-up with Plaintiff in two months for a reassessment for a possible excision (*Id.*).   Plaintiff was seen by Dr. Nwaobasi for a follow-up on August 25, 2011 (Doc. 99-6 at 10).   Dr. Nwaobasi noted there were no signs of significant size increase and indicated Plaintiff was to be seen in six months for reassessment (*Id.*).   Dr. Nwaobasi described Plaintiff's lump as a "soft tissue mass" and "mid thoracic spine lipoma mass" (*Id.*)

A non-defendant nurse practitioner saw Plaintiff for his six-month follow-up regarding the lump on his spine on February 23, 2012 (Doc. 99-6 at 17).   The nurse practitioner described the lump as a "soft movable mass" (*Id.*).   The nurse practitioner noted that Plaintiff complained the mass causes pain when he presses his back against his bunk (*Id.*).   Plaintiff was instructed to follow-up with nurse sick call and contact the HCU if his symptoms worsened, or if there was an increase in size (*Id.*).

Plaintiff was seen by a certified medical technician on November 21, 2014, and complained of pain on his spine related to the mass (Doc. 99-6 at 26).   Plaintiff rated his pain as a 9 out of 10 (*Id.*).   The CMT noted Plaintiff described the pain as "throbbing" and "intermittent,"

---

[1] It is undisputed that the lump on Plaintiff's spine was indeed a lipoma.   The parties include various references to the diagnoses ascribed to the mass throughout their statement of facts.   However, any question about the diagnosis is not necessarily relevant to Plaintiff's claims.   Thus, the Court will only include references to the diagnoses that are pertinent to the issues before the undersigned.   Insofar as the medical records include various terminology to identify the lump, the Court will attempt to reflect the description provided in the medical records as cited.   As such, this Order will include various terms to describe the lipoma.

and referred Plaintiff to a provider (*Id.*).   The CMT also provided seven days of Acetaminophen (*see id.*).   Plaintiff was seen by Defendant Nurse Practitioner Moldenhauer on November 25, 2014 regarding Plaintiff's complaints of the "knot" on his spine (Doc. 99-6 at 27).   Plaintiff indicated the "knot" was getting bigger (*Id.*).   Moldenhauer measured the mass as 5 x 1.5 inches and referred Plaintiff to Defendant Dr. Trost (*Id.*).   Plaintiff was seen by Dr. Trost on December 15, 2014 (Doc. 99-6 at 28).   Dr. Trost noted the lump was a subcutaneous mass over the thoracic spine consistent with a lipoma (*Id.*).   Dr. Trost assessed that the lump was a back lipoma and ordered observation of the same (*Id.*).

Plaintiff did not present to the Menard HCU regarding the lipoma on his back from December 2014 to December 2016 (Doc. 99-1 at 55-56).   Plaintiff also did not write any grievances regarding his medical treatment or the pain he was in related to his back in 2015 or 2016 (*Id.* at 124-25).   Plaintiff, however, testified that he did not request to see a medical provider or file a grievance for the mass on his spine during this time because Wexford and its employees refused to provide additional testing to diagnose the mass, and the only treatment he received was over-the-counter pain medication (*Id.* at 56-57).   Plaintiff also testified he was made to pay $5 every time he requested to see a medical provider and he did not have the money to spend on the same when they were not doing anything for him (*Id.*).

On December 21, 2016, Plaintiff was seen by a nurse in the HCU for complaints of pain related to the lump on his spine (Doc. 99-6 at 56).   Plaintiff was prescribed ibuprofen and referred to a medical provider (*Id.*).   Plaintiff was seen by a non-defendant nurse practitioner on January 3, 2017 (Doc. 99-6 at 58).   The NP noted the mass had increased in size, measuring 12 x 5 centimeters, and was tender with palpation (*Id.*).   Plaintiff also assessed his pain as a 7 out of 10 (*Id.*).   The NP prescribed ibuprofen and ordered x-rays of Plaintiff's thoracic and lumbar spine

(*Id.*).   The ordered x-rays were taken on January 13, 2017 (Doc. 99-6 at 171).   The findings set forth the possibility of a "soft tissue tumor perhaps lipoma," but an ultrasound of the region was recommended for "further assessment and to characterize the tissue characteristics" of the lesion (*Id.*).   Plaintiff was scheduled to be seen by NP Moldenhauer on January 20, 2017, but Plaintiff was absent and therefore, was not seen (Doc. 99-6 at 59).   Dr. Trost sought collegial review for an ultrasound of Plaintiff's "soft tissue tumor" that was approved on January 26, 2017 (Doc. 99-6 at 61, 105).   The ultrasound was performed on February 14, 2017, and showed no distinct mass or cyst and the impression was a possible lipoma (Doc. 99-6 at 62, 106).

Plaintiff was seen by an unknown nurse on March 29, 2017 who evaluated the lump on his back (Doc. 99-6 at 63).   The nurse indicated Plaintiff rated his pain as a 9 out of 10 and Plaintiff was referred to a physician (*Id.*).   Plaintiff was seen by Dr. Siddiqui on April 3, 2017 regarding the mass on his back (Doc. 99-6 at 64).   Dr. Siddiqui noted the lump was along the length of Plaintiff's thoracic spine and felt cystic on palpation (*Id.*).   Dr. Siddiqui noted the ultrasound indicated a possible lipoma, but the lump "[did] not feel like lipoma" (*Id.*).   Dr. Siddiqui submitted a collegial referral for a magnetic resonance imaging ("MRI") scan of the lipoma and the referral was discussed in collegial conference with Dr. Ritz and Dr. Siddiqui on April 10, 2017 (Doc. 99-6 at 66, 107).   The request was denied and an alternative treatment plan was implemented (*Id.*).   Plaintiff was to be monitored on-site, provided analgesics, and modify his activity as tolerated (*Id.*).   It was noted that Plaintiff should be re-presented to collegial if his symptoms worsened (*Id.*).

Plaintiff was seen again by Dr. Siddiqui on May 4, 2017 (Doc. 99-6 at 68).   Dr. Siddiqui noted the "large cystic mass" was linear along the length of Plaintiff's thoracic spine (*Id.*).   Dr. Siddiqui noted he would repeat his request to collegial for an MRI scan (*Id.*).   Dr. Siddiqui made

no note regarding Plaintiff's symptoms and whether they were worse than his previous visit (*see id.*).   Dr. Siddiqui re-presented his request for an MRI with Dr. Ritz during a collegial review on May 10, 2017, wherein he appealed the April 10, 2017 denial (Doc. 99-6 at 70, 109-110).   The request was again denied and Plaintiff was to be monitored onsite (*Id.*).   No treatment changes were made.   Dr. Siddiqui requested a second opinion of the denied appeal (Doc. 99-6 at 111).   The appeal was submitted to Dr. Garcia, who upheld Dr. Ritz's decision for an alternative treatment plan finding the mass to be a benign lipoma per the ultrasound report on May 18, 2017 (*Id.* at 111-112).

Plaintiff was seen by Dr. Siddiqui on June 27, 2017 wherein he again noted the mass along Plaintiff's spine (Doc. 99-6 at 76).   Dr. Siddiqui noted photographs of Plaintiff's back mass were to be sent to collegial (*Id.*).   On July 14, 2017, Dr. Siddiqui requested a collegial referral for an MRI scan of Plaintiff's lipoma and a general surgery evaluation (Doc. 99-6 at 113).   Dr. Siddiqui re-presented the previous ultrasound information, but noted again that it "did not feel like lipoma" (*Id.*).   Photographs were also sent in with the referral (*Id.*).   Dr. Fisher discussed the referral in collegial review with Dr. Siddiqui, and Dr. Fisher approved Dr. Siddiqui's request for an MRI (*Id.*).   Dr. Fisher and Dr. Siddiqui agreed to wait on the results from the MRI for additional treatment planning, including a surgical evaluation referral (*Id.*).

An MRI was performed on August 4, 2017, which showed an encapsulated subcutaneous soft tissue mass consistent with a fat-containing tumor that may represent an atypical lipoma with liposarcoma not excluded (Doc. 99-6 at 119).   The mass measured 18.3 x 5.3 x 3.6 centimeters (*Id.*).   Surgical excision was recommended to exclude a liposarcoma (*Id.*).   Dr. Siddiqui referred Plaintiff for a general surgery evaluation on September 22, 2017 (Doc. 99-6 at 86).   The referral request was discussed in collegial review on September 8, 2017 with Dr. Ritz and Dr. Siddiqui

(Doc. 99-6 at 87, 115).   Dr. Ritz approved Dr. Siddiqui's request for a general surgery evaluation and Plaintiff was seen by a surgeon for evaluation on October 18, 2017 (Doc. 99-6 at 115, 117). Dr. Siddiqui presented a collegial referral for surgical excision of the lipoma on Plaintiff's spine on October 27, 2017, and it was approved by Dr. Smith (Doc. 99-6 at 91, 121).   Plaintiff had surgery on November 9, 2017 to remove the lipoma (Doc. 99-6 at 126, 130; *see also* Plaintiff's Medical Records from Carbondale Memorial Hospital, Doc. 99-7).   The pathology results final diagnosis was a soft tissue, midline back excision consistent with lipoma (*Id.* at 62).

### Plaintiff's Symptoms

It is undisputed that the lump on Plaintiff's back was a lipoma.   A lipoma is a benign fatty tumor (Declaration of Stephen Ritz, D.O., Doc. 99-4 at ¶ 8).   Dr. Siddiqui testified that lipomas are not cancer, are usually not problematic, and typically removed only for cosmetic reasons (Deposition of Dr. Siddiqui, Doc. 99-8 at 18-20).   Removal would also be indicated if it was causing pain or pressure (Doc. 99-8 at 21).   Dr. Siddiqui also testified that benign lipomas are generally painless (*Id.* at 18).   Although the lipoma itself is not painful, it can cause discomfort depending on its location (*Id.*).   Dr. Siddiqui testified that if the patient's lipoma is symptomatic and the symptom needs to be relieved, then the lipoma can be removed (*Id.* at 26).

Plaintiff testified that he experienced chronic back and nerve pain associated with the lipoma on his back from 2011 until its removal in 2017 that affected his daily activities, including sleeping and working out (Doc. 99-1 at 133-34).   More specifically, at his deposition, Plaintiff testified that around November 2014 his back pain limited his ability to write, and he could not sit in a chair, lay down, or stand up comfortably (*Id.* at 45-46).   Plaintiff testified he explained the pain he was experiencing to Moldenhauer in November 2014 (*Id.* at 46-47).   Plaintiff also testified that he told Dr. Trost in December 2014 about the pain caused by the lipoma and that it

was affecting his sleep and ability to workout (*Id.* at 52).   Plaintiff asked Dr. Trost for an MRI to determine what the lump was so he could have it removed (*Id.* at 53-54).   Following his surgery, Plaintiff testified he still experiences numbness, weakness, and pain (*Id.* at 16).   In December 2016, Plaintiff testified he experienced significant pain, struggled to sleep and workout, and experienced involuntary movements related to the lipoma (*Id.* at 59-62).   Immediately after surgery Plaintiff denied any pain or discomfort (Doc. 99-6 at 97-100).

### *Wexford Utilization Management Process*

Wexford employs a utilization management process and has policies and procedures in place utilized by physicians and other health care providers as guidelines for treating inmates within the IDOC (*see* Doc. 99-4 at ¶ 5).   Collegial review is a component of Wexford's utilization management process (*Id.*).   Collegial review is utilized when an onsite provider makes a written request for use of offsite resources, such as for a specialist consultation or diagnostic testing (*Id.* at ¶ 6).   During said review, discussion is held between a utilization management corporate medical director and the site medical director concerning the patient's relevant medical history, pertinent clinical findings, pertinent diagnostic or laboratory testing, and the proposed plan of care (*Id.*).

As part of the collegial review process, the consult coordinator obtains the medical records associated with a referral request and submits all supporting documentation for the review (*see* Doc. 118-1).   Prior to collegial review, the Utilization Management Physician will have the materials that were sent from the consult coordinator at the site (Deposition of Hector Garcia, M.D., Doc. 99-5 at 49).

### *The "Lippert Report"*

In Plaintiff's Statement of Additional Undisputed Facts (Doc. 111), he cites to the "Lippert Report" in paragraphs 82 through 87.   The Lippert Report refers to a final expert witness report

submitted in *Lippert v. Godinez*, Case No. 10-cv-04603, relating to medical care provided by Wexford at IDOC facilities.   Plaintiff cites the "Lippert Report" in support of his assertion that Wexford adopted policies and/or practices that resulted in his alleged constitutional violations.

Plaintiff asserts that the "Lippert Report" is a document in the public record and, as such, the Court can take judicial notice of the same.

The Wexford Defendants object to the use of the "Lippert Report", asserting it is inadmissible in this case and cites to evidence not in the record.   The Court agrees.   As found by the Seventh Circuit, the report is not authenticated by its authors or the persons quoted within it, it is not a public record, and there is no appropriate hearsay exception.   *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 522 (7th Cir. 2019) (citations omitted).   There is no basis on which the Court can consider the "Lippert Report."   As such, the facts set forth by Plaintiff on which he relies on the report have not been considered in this Order.

### *Plaintiff's Grievances and Requests for Medical Treatment*

Plaintiff testified he submitted four emergency grievances regarding the lump on his back to Defendant Butler: one in 2011, one in 2012, and two in 2014 (Doc. 99-1 at 120-121).   Plaintiff placed all of these grievances in Defendant Butler's mailbox, which was the only option he had to communicate with her (Doc. 99-1 at 120-21).   Plaintiff attached an emergency grievance dated August 29, 2011 to his complaint wherein he complains that the lump on his back is still causing him pain and he seeks surgery for the same (*see* Doc. 1 at 18-19).   There is no facility or Administrative Review Board ("ARB") response to this grievance.   Plaintiff testified that he does not know if Butler received the grievances he submitted in 2011 or 2012, including the August 2011 emergency grievance (Doc. 99-1 at 120-121).

Also attached to the complaint are two emergency grievances dated December 18 and

December 30, 2014 (*see* Doc. 1 at 20-21, 24-24).   There is no facility or ARB response to these grievances and there is no record of the grievances being received by the Grievance Office (*see* Doc. 47-3).   Plaintiff attached a letter directed to Defendant Butler dated December 30, 2014 regarding the issues in this lawsuit and explaining he has attempted to submit emergency grievances and has not received any response (*see* Doc. 1 at 22-23).   Plaintiff does not know if Butler received or reviewed these grievances (Doc. 99-1 at 123).   Plaintiff testified he also sent Butler a letter in November 2014, but he did not make a copy of the same and has no evidence that it was received by Butler (Doc. 99-1 at 117-18).   Plaintiff testified he spoke with Butler on one occasion around November or December 2014 and told her he had written her a letter and submitted a grievance about his medical condition (Doc. 99-1 at 114 – 116).   Plaintiff testified Butler told him she did not know if she received a letter and told him to write her again and follow through with the grievance process (*Id.* at 119).

Defendant Butler was the Warden of Menard from approximately April 2014 through September 2016 (Declaration of Kimberly Butler, Doc. 102 at ¶ 1).   From April 2016 through September 2016 Butler was also Chief of Programs for the State, so the assistant wardens handled the day-to-day operations of Menard (*Id.*).

Butler attests she does not recall seeing any letters, kites, or grievances from Plaintiff (Doc. 102 at ¶ 8).   She would not have personally reviewed a kite or letter sent to her office, as it would have been delegated to her office staff to direct it to the appropriate department (*Id.*).   Butler also does not recall having an in-person conversation with Plaintiff in November or December 2014; however, she generally instructed inmates to follow the grievance process (*Id.* at ¶ 11).   Finally, Butler asserts she did not receive Plaintiff's emergency grievances dated August 29, 2011, December 18, 2014, or December 30, 2014 (*Id.* at ¶ 10).   Butler asserts that although she tried to

personally review grievances marked for emergency review, grievances that went through the normal grievance process were generally reviewed by one of her designees, an assistant warden, due to the amount of paperwork she received on a daily basis (*Id.* at ¶ 9).

## Legal Standards

### Summary Judgment Standard

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

### Eighth Amendment Deliberate Indifference

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on such a claim, Plaintiff must show first

that his condition was "objectively, sufficiently serious" and second, that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted).

With regard to the first showing, the following circumstances could constitute a serious medical need: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); *see also Foelker v. Outagamie Cnty.,* 394 F.3d 510, 512-13 (7th Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

A prisoner must also show that prison officials acted with a sufficiently culpable state of mind, namely, deliberate indifference. "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'." *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even recklessness as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823, F.2d 1068, 1072 (7th Cir. 1987). Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. A plaintiff does not have to prove that his complaints were "literally ignored," but only that "the defendants' responses were so plainly inappropriate as to permit the

inference that the defendants intentionally or recklessly disregarded his needs." *Hayes,* 546 F.3d at 524 (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)).

## Discussion

As a preliminary matter, the Court addresses Plaintiff's argument that because the potential for cancer existed in April 2011, the Wexford Defendants were deliberately indifferent in waiting until August 2017 to provide Plaintiff an MRI and November 2017 to excise the lump on his back. He bases this claim on the possibility that the lump *could have been* cancerous; although he does not dispute that the lump was found to be a lipoma upon excision.   To be successful on an Eighth Amendment claim, a plaintiff must show not only that a defendant was deliberately indifferent to a serious medical need, he must also show that the breach caused him to suffer a cognizable legal harm.   *Doe v. Welborn*, 110 F.3d 520, 523 (7th Cir. 1997) (citing *Babcock v. White*, 102 F.3d 267, 271 (7th Cir. 1996)).   Here, Plaintiff has not set forth any evidence or made any argument that he suffered a "cognizable legal harm" from the failure to definitively diagnose his lipoma prior to 2017.   Without harm, there is no cause of action.   For this reason, to the extent Plaintiff attempts to set forth a claim related to the potential for the lump to be cancerous until its excision in 2017, Defendants are entitled to summary judgment on the same and it will not be discussed further. The discussion below concerns Plaintiff's argument that Defendants were deliberately indifferent in failing to excise the lipoma from April 2011 until November 2017 as it was causing Plaintiff chronic pain.

The Court also must address the cursory argument brought by Defendants Moldenhauer, Ritz, Garcia, Trost, and Wexford that they are entitled to qualified immunity (Doc. 99 at 15).   Not only is this argument lacking in specificity and substance, but it is also futile as the Seventh Circuit has clearly stated that "private prison employees are barred for asserting qualified immunity from

suit under § 1983." *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 794 (7th Cir. 2014).

Finally, the Court disagrees with the Wexford Defendants' argument that Plaintiff cannot demonstrate he suffered from a serious medical need. As mentioned above, a serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *See Foelker.,* 394 F.3d at 512-13. Defendants' own argument on this point details the medical treatment Plaintiff received, which highlights the necessity of medical attention. Further, a lump on an individual's back is necessarily concerning and a lay person would recognize the need for a doctor's attention to the same. While the Court recognizes a lipoma may not *always* require excision or further treatment, Plaintiff's ultimately did, as demonstrated by the medical record. Further, the Seventh Circuit recognizes that a serious medical need exists where the condition features "chronic and substantial pain," which Plaintiff has presented evidence of here. *Hayes*, 546 F.3d at 523 (citing *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997).

### 1. Nurse Practitioner Michael Moldenhauer

Plaintiff asserts Defendant Moldenhauer was deliberately indifferent to his medical needs because he knew in November 2014 that Plaintiff was experiencing significant pain due to the lipoma on his back, but he failed to provide any medical treatment.

In viewing the evidence in the light most favorable to Plaintiff as this Court must do at this stage in the proceedings, the Court finds Plaintiff saw Moldenhauer on November 25, 2014. Moldenhauer measured the mass and referred Plaintiff to Dr. Trost. Plaintiff explained he was experiencing pain due to the lump on his back and conveyed the limitations it was causing on his ability to write, sit, lay, and stand.

While the Court acknowledges Plaintiff advised Moldenhauer he was in pain and

Moldenhauer took no particular action to address the same, Moldenhauer did refer him to Dr. Trost for further evaluation, and Dr. Trost saw him within approximately three weeks.   Moldenhauer also saw Plaintiff just three days after the medical technician noted Plaintiff was provided with a seven-day supply of Acetaminophen.   This one occasion wherein Moldenhauer failed to provide pain medication or further treatment for Plaintiff's lipoma is simply not enough to rise to the level of deliberate indifference.   Indeed, with regard to examination of the lipoma, Moldenhauer followed the procedure in referring Plaintiff to Dr. Trost (*see* Doc. 99-1 at 50).   Moreover, the Court finds that, at most, Moldenhauer's failure to provide pain medication or other treatment in November 2014 was an isolated incident of neglect, and such isolated instances of neglect are generally insufficient to support of claim of Eighth Amendment deliberate indifference.   *See Gutierrez v. Peters*, 111 F.3d at 1374.   Because Moldenhauer referred Plaintiff to be seen by Dr. Trost for further treatment, his failure to address Plaintiff's complaint of pain on this one occasion does not rise to the level of deliberate indifference and Moldenhauer is entitled to judgment as a matter of law.

### 2.  Dr. John Trost

Plaintiff asserts Dr. Trost was deliberately indifferent to his medical needs because Dr. Trost knew in November 2014 that Plaintiff experienced significant pain, but Dr. Trost failed to provide any medical treatment to Plaintiff.

It is undisputed that Dr. Trost examined Plaintiff on December 15, 2014 and noted the mass over Plaintiff's thoracic spine was consistent with a lipoma.   Dr. Trost assessed that the mass was a lipoma and his plan was to observe the same.   Dr. Trost did not take any action to address Plaintiff's complaints of pain or otherwise excise or definitively diagnose the lipoma.   While the Court acknowledges Dr. Trost's position that Plaintiff did not complain about pain because there is

no notation regarding the same in the medical records, Plaintiff testified to the contrary, and the evidence must be viewed in Plaintiff's favor at this time.   Moreover, Dr. Trost represented that he relies on a patient's medical records to inform his medical judgment and form the basis of his medical opinion (Affidavit of John Trost, M.D., Doc. 99-2 at ¶ 4).   Plaintiff's medical records in December 2014 documented complaints of pain at a level of 9 out of 10 less than one month prior, on November 21, 2014.   Plaintiff's medical records also evidenced Plaintiff began complaining about the lipoma in 2011, and excision was considered in June 2011.   The medical records also documented Plaintiff's consistent complaints of pain from 2011 to 2012, and again in November 2014 until he saw Dr. Trost.   Viewing this evidence in the light most favorable to Plaintiff, Dr. Trost's failure to render any treatment to address Plaintiff's complaints of pain or seek further testing to diagnose and assess the lipoma to address the cause of the pain would permit a reasonable jury to find Dr. Trost acted with deliberate indifference.   Accordingly, Dr. Trost's motion for summary judgment must be denied.

### 3.  Dr. Stephen Ritz

Plaintiff asserts Dr. Ritz was deliberately indifferent to his medical condition insofar as he knew Plaintiff experienced pain and discomfort for over six years from the lipoma on his back, yet he offered no new medical treatment or additional diagnostic testing.

By way of background, Dr. Ritz is a licensed physician and has been employed as Wexford's Corporate Utilization Management Medical Director since September 1, 2014, and the Chief Medical Officer since July 5, 2020 (Declaration of Steven Ritz, D.O., Doc. 99-4 at ¶ 3). The undisputed record demonstrates that Dr. Ritz became involved in Plaintiff's medical care in January 2017, wherein Dr. Ritz approved Dr. Trost's request for an on-site ultrasound of the mass on Plaintiff's back (*see* Doc. 99-6 at 105).   Dr. Ritz was again involved in Plaintiff's medical care

in April and May 2017, wherein he denied Dr. Siddiqui's request for an MRI of the lipoma and implemented an alternative treatment plan to monitor Plaintiff onsite, provide analgesics, and modify Plaintiff's activities.

Plaintiff contends at the time Dr. Ritz denied Dr. Siddiqui's referral requests, Dr. Ritz would have had knowledge of all the pertinent information contained in Plaintiff's medical records regarding the lipoma on Plaintiff's back, including his ongoing complaints of pain, which persisted despite pain medication.   Plaintiff asserts that Dr. Ritz's denial of the referral requests amounted to deliberate indifference as he delayed additional treatment for Plaintiff despite continuing complaints of pain and despite the lipoma markedly increasing in size, from 10 x 5 centimeters ("egg size") in June 2011 to 18.3 x. 5.3 x. 3.6 in 2017 (Doc. 99-6 at 119).

In this instance, Dr. Ritz's denials of Dr. Siddiqui's referral requests ultimately resulted in an approximate three-month delay in Plaintiff receiving additional treatment to address his pain and discomfort, including an MRI, referral to a surgeon, and excision of the lipoma.   A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain.   *Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir. 2010); *Edwards v. Snyder*, 478 F.3d 827, 832 (7th Cir. 2007).   The length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.   *See McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) (the defendant dentist could be liable for three-month delay in treating the plaintiff's dental pain if dentist was aware of the severity of the plaintiff's dental problems and refused to approve a dental visit); *Grieveson v. Anderson*, 538 F.3d 763, 778-80 (7th Cir. 2008) (guards could be liable for delaying treatment for painful broken nose by at least a day-and-a-half).   In this case, the Court finds a reasonable jury could find the three-month delay attributable to Dr. Ritz's collegial review denials constituted deliberate indifference to the

pain and discomfort caused by Plaintiff's lipoma.   As such, Dr. Ritz's motion for summary judgment must be denied.

### 4.   Dr. Hector Garcia

Similar to Dr. Ritz, Plaintiff asserts Dr. Garcia was deliberately indifferent to his medical condition insofar as he knew Plaintiff experienced pain and discomfort for over six years from the lipoma on his back, yet he offered no new medical treatment or additional diagnostic testing.   Dr. Garcia is a licensed physician who was employed at Wexford as the National Medical Director for eleven years before retiring in 2021 (Doc. 99-5 at 16-17).

The undisputed record demonstrates that Dr. Garcia reviewed Dr. Siddiqui's appeal of Dr. Ritz's denial of his requested referral for an MRI on May 18, 2017.   Thus, Dr. Garcia upheld the alternative treatment plan rendered by Dr. Ritz.   Similar to Dr. Ritz, the evidence in the record is sufficient to establish that Dr. Garcia knew or should have known Plaintiff's medical history regarding his lipoma and the pain it was causing Plaintiff.

While any delay in treating Plaintiff's pain attributable to Dr. Garcia is somewhat less than the delay caused by Dr. Ritz, the Court declines to find, as a matter of law, that a two-month delay as opposed to a three-month delay does not substantiate a finding of deliberate indifference. Based on the circumstances in this case and record before the Court, such a decision is best left to a jury.   Because the Court finds a reasonable jury could find a two-month delay attributable to Dr. Garcia's actions constituted deliberate indifference to the pain and discomfort Plaintiff was experiencing as a result of the lipoma on his back, Dr. Garcia's motion for summary judgment is denied.

### 5.   Wexford Health Sources, Inc.

Plaintiff asserts Wexford is liable under the Eighth Amendment because there are issues of

fact as to whether Wexford condoned and/or adopted the Wexford Defendants' misconduct and because the Seventh Circuit recently expressed 'serious doubts" as to whether private corporations can avail themselves of the bar on *respondeat superior* liability created by *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978).

First, the Court addresses Plaintiff's contention regarding *respondeat superior* liability. Although Plaintiff does not identify the Seventh Circuit opinion on which he relies, the Court finds Judge Hamilton, in a concurring opinion in *Reck v. Wexford Health Sources, Inc.*, -- F.4th – at *12 (7th Cir. 2022), reiterated his concerns regarding the application of *Monell* to private corporations like Wexford when said corporations should be subject to *respondeat superior* liability. *See Shields v. Illinois Dep't of Corrections*, 746 F.3d 782, 789-96 (7th Cir. 2014).   However, the law of this Circuit still provides for the application of *Monell* to Wexford in this case and that is the law that will be applied.

*Monell* provides that where a private corporation has contracted to provide essential government services, such as health care for prisoners, the private corporation cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself.   *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).   Accordingly, in order for Plaintiff to recover from Wexford, he must offer evidence that an injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy.   *Shields*, 746 F.3d at 796.   Plaintiff must also show that policymakers were aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect him. *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009).   Finally, a policy or practice "must be the 'direct cause' or 'moving force' behind the constitutional violation."

*Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (internal citations omitted).

Here, Plaintiff has not identified any particular policy or practice that was employed by Wexford that caused a constitutional violation.   In his response brief, Plaintiff cites the "Lippert Report" in support of his policy and practice argument.   However, as set forth above, the Report is inadmissible hearsay and cannot be considered.   Because Plaintiff has not set forth any other evidence to demonstrate an unconstitutional policy or practice adopted and implemented by Wexford, summary judgment in favor of Wexford is appropriate.

### 6.  Kimberly Butler

Plaintiff asserts Defendant Butler was deliberately indifferent to his medical condition because she failed to take any action upon receiving notice that there was a serious risk to his health.

Plaintiff testified he submitted four emergency grievances regarding the lump on his back to Defendant Butler from 2011 through 2014.   Plaintiff also asserts he sent her a letter and had an in-person conversation with her in which he told Butler he had written her a letter and submitted a grievance about his medical condition.

First, with regard to the grievances and letter in the record, even when the evidence is viewed in the light most favorable to Plaintiff, the Court cannot find that any grievance or letter was ever received or reviewed by Butler.   The Court acknowledges Plaintiff's testimony that he placed the grievances in Butler's mailbox; however, this is not enough to establish Butler had notice of the grievances.   The grievances themselves have no response from Butler (or any staff member) and Plaintiff has no evidence she received the same.   Thus, the Court finds the grievances and letter were insufficient to notify Butler of any serious risk to Plaintiff's health and

she was not deliberately indifferent to the same.

With regard to Plaintiff's contention that he spoke to Defendant Butler in 2014 and advised her he submitted several emergency grievances and letters to her, the Court finds this isolated communication is also insufficient to substantiate a claim of deliberate indifference as to Butler. Plaintiff only spoke with Defendant Butler on one occasion, and there is little evidence in the record as to what the communication consisted of and how Plaintiff presented his health care concerns and treatment.   While officials may not turn a blind eye to a constitutional violation, such limited, informal, and fleeting interactions do not substantiate a finding that Butler acted with deliberate disregard to a substantial risk of serious harm to Plaintiff.   *See Owens v. Duncan*, 788 F. App'x 371, 374 (7th Cir. 2019) (finding allegations that staff members who had a single interaction with the plaintiff did not amount to a plausible claim that the defendants knew of and disregarded a serious medical risk).   Accordingly, summary judgment in favor of Defendant Kimberly Butler is warranted[2].

## Conclusion

Based on the foregoing, the Motion for Summary Judgment for Deliberate Indifference to a Serious Medical Need filed by Defendants Moldenhauer, Ritz, Garcia, Trost, and Wexford (Doc. 98) is **GRANTED IN PART AND DENIED IN PART**, and the Motion for Summary Judgment filed by Defendant Butler (Doc. 100) is **GRANTED**.   Judgment shall be entered in favor of Defendants Michael Moldenhauer, Wexford Health Sources, Inc., and Kimberly Butler and against Plaintiff Reco Wilson at the close of this case.   Plaintiff will proceed in this case on the following claim:

---

[2] Because the Court finds Defendant Butler was not deliberately indifferent, the undersigned does not address Butler's statute of limitations or qualified immunity arguments.

Count 1:        Ritz, Garcia, and Trost were deliberately indifferent to the lump on Plaintiff's back in violation of the Eighth Amendment.

**IT IS SO ORDERED.**

**DATED: March 17, 2022**

*s/  Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**